IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MELODY OWIANNAI SAYRE, on her own behalf and on behalf of all others similarly situated,<br><br>   *Plaintiff*,<br><br>   v.<br><br>WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES<br>   *Defendant*. | Civil Action No. ELH-15-687 |

**MEMORANDUM OPINION**

On January 23, 2015, plaintiff Melody Owiannai Sayre filed a "Class Action Complaint" in the Circuit Court for Baltimore City against defendant Westlake Services, LLC, d/b/a Westlake Financial Services ("Westlake"). *See* ECF 2 at 1 ("Complaint"). In two counts, Sayre alleged that Westlake's defective "redemption notices" violated statutory rights under Maryland Credit Grantors Closed End Credit Provisions ("CLEC"), Md. Code (2013 Repl. Vol., 2014 Supp.), §§ 12-1001 *et seq*. of the Commercial Law Article ("C.L."), and constituted a breach of contract. Plaintiff seeks, *inter alia*, an order under C.L. § 12-1018(a)(2), which would bar Westlake from collecting any amounts in excess of the original principal amount of each class member's loan. Noticeably absent from the suit is any specific claim of damages. Rather, plaintiff states only that her claim does not exceed $74,999.99, and the claims on behalf of the class exceed $75,000. ECF 2 at 9 n.1.

Westlake removed the suit to federal court. *See* Notice of Removal (ECF 1, "Notice"). The Notice alleged subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453. ECF 1 at ¶¶ 6-14. Pursuant to § 1332(d), Westlake explained in its

Notice that this Court has jurisdiction under CAFA because: "(1) minimum diversity is satisfied; (2) the number of putative class members is greater than 100; and (3) the amount in controversy exceeds $5 million." ECF 1 at ¶ 7.

In response, Sayre filed a Motion to Remand (ECF 13, "Motion to Remand" or "Motion"), disputing this Court's jurisdiction. In particular, Sayre insists that "Westlake has not introduced evidence sufficient to prove that the amount in controversy . . . is greater than five million dollars ($5,000,000.00)," as required under § 1332(d)(2). ECF 13 at 1. Sayre "demands strict proof that the amount in controversy exceeds $5,000,000.00," and argues that Westlake only offered an "unsupported factual allegation. . . ." *Id.* at 2. Defendant has opposed the Motion (ECF 20, "Opposition"), and has submitted the Affidavit of Jonathan Zhan (ECF 20-1), Westlake's Assistant Vice President of Finance, to support its Opposition. Plaintiff replied (ECF 22, "Reply"). With leave of Court (ECF 25), Westlake filed a surreply (ECF 26, "Surreply").

No hearing is necessary to resolve the Motion to Remand. *See* Local Rule 105.6. For the reasons that follow, I will deny the Motion (ECF 13).[1]

## I.   Factual Background

On January 3, 2011, Sayre purchased a 2006 Chrysler Sebring from Deer Automotive Group LLC, d/b/a Liberty Ford. ECF 2 ¶ 20, Complaint. The car was purchased "primarily for personal, family and household purposes." *Id.* ¶ 23. To facilitate the purchase, Sayre obtained $7,619.25 in financing through Liberty Ford. *Id.* ¶¶ 21, 26. The financing agreement was "memorialized" in a retail installment sales contract ("RISC"), *id.* ¶ 21, and assigned to Westlake. *Id.* ¶ 24. Westlake obtained a lien and a security interest in the vehicle. *Id.* ¶ 25. Of relevance here, the RISC stipulated that the contract shall "be governed" by CLEC. *Id.* ¶ 22.

---

[1] This Memorandum Opinion does not address defendant's motion to compel arbitration (ECF 21), which remains pending.


According to Sayre, Westlake became the "credit grantor" and she is the "consumer borrower."[2] *Id.* ¶¶ 17, 19.

Pursuant to the RISC, and "[t]hroughout the life of the CLEC credit account, Sayre made numerous payments to Westlake that included principal, interest and fees." *Id.* ¶ 27. Specifically, Sayre paid Westlake "payments . . . equal to or greater than $12,174.98." *Id.* ¶ 28. At some point, however, Sayre's payments under the RISC became "past due." *Id.* ¶ 33. As a result, on or before May 7, 2014, "Westlake and/or its agents seized and repossessed" Sayre's vehicle. *Id.* ¶ 29.

Six days later, on May 13, 2014, Westlake mailed a "redemption notice" to Sayre, dated May 11, 2014. *Id.* ¶¶ 30, 31, 32. *Id.* ¶ 31. The purpose of the redemption notice was to notify

---

[2] C.L. § 12-1001(g) defines "credit grantor" as follows:

(1) "Credit grantor" means any individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity making a loan or other extension of credit under this subtitle which is incorporated, chartered, or licensed pursuant to State or federal law, the lending operations of which are subject to supervision, examination, and regulation by a State or federal agency or which is licensed under Title 12, Subtitle 4 of the Financial Institutions Article or is a retailer.

(2) "Credit grantor" includes:
    (i) Any bank, trust company, depository institution, or savings bank having a branch in this State;
    (ii) A person not required to be licensed under this subtitle, who is exempt from the licensing provisions of Title 11, Subtitle 5 of the Financial Institutions Article, who makes a loan or extension of credit under this subtitle secured by a secondary mortgage on residential real property; and
    (iii) Any person who acquires or obtains the assignment of an agreement for an extension of credit made under this subtitle.

C.L. § 12-1001(f) defines "consumer borrower" as someone "receiving a loan or other extension of credit . . . for personal, household, or family purposes or an individual receiving a commercial loan or other extension of credit for any commercial purpose not in excess of $75,000, secured by residential real property."

Westlake's CLEC customers of Westlake's "plan to sell" the seized property. *Id.* ¶ 9. According to the Complaint, sending customers such redemption notices was a "routine business practice" of Westlake. *Id.* But, plaintiff contends that Westlake "routinely fails to place its redemption notices to its CLEC customers in the mail on the same date contained in the letter." *Id.* ¶ 10. Moreover, she claims the redemption notices are inaccurate and omit material information. *Id.* ¶¶ 12, 13.

The redemption notice at issue here informed Sayre that "she had the right to redeem [the vehicle] within fifteen days of the date of the redemption notice and no later than May 27, 2014 at 8:00 a.m." *Id.* ¶ 32. The redemption notice further provided that Sayre "was still entitled to get her 2006 Chrysler Sebring back after the fifteen day redemption period expired by paying the entire remaining balance due and owning [sic] on the CLEC credit account along with all the other expenses related to the repossession." *Id.* ¶ 34. Sayre challenges the redemption notice as both deficient and untimely. Among other defects, Sayre complains that defendant did not offer her "an appropriate amount of time to redeem" her car. *Id.* ¶ 39.

As indicated, Sayre brought this case as a class action. In her Complaint, Sayre alleges, *inter alia*, that from 2009 to the present, Westlake has extended secured financing for personal property to more than 500 borrowers in Maryland "each year," *id.* ¶ 5; Westlake has extended secured financing through credit contracts electing CLEC for more than 100 borrowers in Maryland per year from 2009 to the present, *id.* ¶ 6; since 2009, Westlake has purchased portfolios of loans originating in Maryland that contain CLEC credit contracts, *id.* ¶ 7; and since 2009 Westlake repossessed secured property from more than 100 borrowers that "originated from" CLEC credit contracts. *Id.* ¶ 8.

Westlake defines the proposed class as follows, *id.* ¶ 35 (emphasis in Complaint):

4

**All persons whose personal property was repossessed by Westlake in connection with a credit contract governed by CLEC.**

Excluded from the Class are those individuals who now are or have ever been executives of the Defendant and the spouses, parents, siblings and children of all such individuals.  Also excluded from the Class are all persons whose credit accounts were discharged in a bankruptcy and whose repossessed personal property account resulted in a judgment prior to the date of the filing of this action.

Sayre alleged in the Complaint that the putative class consists, "at a minimum, of more than one hundred borrowers who entered into a CLEC credit contract directly with or that was assigned to or purchased by Westlake and whose personal property was subsequently repossessed . . . ." ECF 2 ¶ 37.  Notably, the proposed class is not limited to a particular period of time.  Indeed, Westlake has characterized the class definition as "sweeping." ECF 20 at 3.

In response to the Complaint, Westlake conducted a review of its database to identify all Maryland accounts that fall within Sayre's putative class definition, in order to calculate the amount in controversy and the size of the potential class.  Westlake's review was conducted by Jonathan Zhan, its Assistant Vice President of Finance, on March 9, 2015, and March 24, 2015. *See* ECF 20-1, ¶¶ 1, 7.  Zhan identified all customer accounts governed by CLEC between January 19, 2006, and January 23, 2015, in which personal property was repossessed. *Id.* ¶¶ 7, 8. Zhan also removed from the database any accounts that fell within Sayre's limited exclusions to her proposed class definition. *Id.* ¶ 7.  He identified 2,521 customers whose personal property was repossessed by Westlake between January 19, 2006, and January 23, 2015 (the date suit was filed).  From the Westlake business records for these 2,521 accounts, Zhan determined (1) the original principal amount of each account; (2) the amount still owed to Westlake on each account; and (3) the total payments collected by Westlake on each account. *Id.* ¶ 8.

Zhan averred, under oath, as follows, ECF 20-1, ¶¶ 9-11:

9. On the date that the Complaint was filed, January 23, 2015, account debtors within the purported class definition owed Westlake $6,383,983 over and above the original principal amounts of the loans. In accordance with Plaintiff's requested relief, this is the amount that Westlake would be unable to collect if the Court grants Plaintiff that relief.

10. Additionally, as of January 23, 2015, Westlake had collected from 986 accounts a total of $2,690,396 in excess of the principal amount of those loans. In accordance with Plaintiff's requested damages, this amount represents potential refunds that Westlake would have to provide to class members if the Court granted Plaintiff that relief.

11. I calculated the amount in controversy by adding the potential damages to Westlake as alleged in the Complaint and represented by amounts that Westlake would be unable to collect ($6,383,983) plus the amount of potential refunds that Westlake would be required to make ($2,690,396). As a result, the amount in controversy in the captioned case is $9,074,379.[]

Additional facts are included in the Discussion.

## II.   Discussion

In pertinent part, 28 U.S.C. § 1332(d)(2) states:

The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;
(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

Also of relevance, 28 U.S.C. § 1453(b) provides: "A class action may be removed to a district court of the United States in accordance with section 1446 . . . , without regard to whether any defendant is a citizen of the State in which the action is brought. . . ." Among other things, § 1446 requires the defendant "desiring to remove any civil action from a State court" to provide in its notice of removal "a short and plain statement of the grounds for removal . . . ."

According to Westlake "minimum diversity" requires only that at least one member of

the putative class be diverse from the defendant. ECF 1 ¶ 10 (citing 28 U.S.C. § 1332(d)(2)(A)). Westlake maintains that this requirement is satisfied. *Id.* ¶ 10. It explains that Westlake is an an "'unincorporated association,'" *id.* ¶ 8, which is "'deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.'" *Id.* ¶ 8 (quoting 28 U.S.C. § 1332(d)(10)). Because Westlake maintains its principal place of business in California and is organized under the laws of California, Westlake asserts that it is a citizen of California. *Id.* ¶ 8. Plaintiff, on the other hand, is a citizen of Maryland. *Id.* ¶ 9.

Because plaintiff and defendant are citizens of different states, minimum diversity is satisfied. *Id.* ¶ 10. Plaintiff does not contend otherwise. Rather, in the Motion to Remand, Sayre contends that Westlake has failed to establish that the amount in controversy exceeds $5 million, which is necessary to establish jurisdiction under CAFA. ECF 20 at 2.

As noted, Westlake submitted the Affdavit of Jonathan Zhan, its Assistant Vice President of Finance. ECF 20-1, ¶ 1. Zhan explained that there are 2,521 accounts identified in the Westlake database that satisfy the criteria of the putative class between January 19, 2006 and March 24, 2015. *Id.* ¶ 8.[3] For those accounts, Zhan reviewed "(1) the principal amount of each account; (2) the amount owed to Westlake on each account; and (3) the total payments collected by Westlake on each account, as well as other information." *Id.* He also analyzed the "(1) amounts still owing on the accounts in excess of the original principal amount of the loans, and (2) the amounts collected on accounts in excess of the original principal amount of the loans." *Id.* Based on Zhan's analysis, he asserted that the amount in controversy exceeds $9 million.[4]

---

[3] In the Complaint, plaintiff focused on defendant's conduct beginning in 2009. *See* ECF 2, ¶¶ 5-8. But, as noted, plaintiff's proposed class has no restrictions or limitations as to time. Moreover, plaintiff does not attack Zhan's analysis on the ground that the period he reviewed is too broad.

[4] Zhan also said, ECF 20-1 ¶11 n.1:

7

Notwithstanding the calculations presented in the Zhan Affidavit, Sayre disputes that Westlake has established the requisite amount in controversy. Plaintiff complains that Zhan's Affidavit is not supported by any documentation, nor has she had an opportunity "to cross-examine" him or "to test the accuracy of [his] representations, all of which are solely under the possession, custody and control of Westlake." ECF 22 at 2, Reply. Moreover, Sayre seeks additional proof that the information provided in the Affidavit concerning the amount in controversy is accurate, because "[r]epresentations contained in court papers are not always accurate." *Id.* at 2. She also requests limited jurisdictional discovery" in connection with the amount in controversy. *Id.* at 1, 3-4. And, she asks the Court to direct Westlake to provide, *inter alia*, "an unlocked and searchable excel spreadsheet containing the 2,521 class member accounts," to include several categories of personal information relating to the putative class members. *Id.* at 4.

In sum, the Motion to Remand implicates two key issues. The first is whether defendant has adequately shown that the amount in controversy exceeds the required threshold amount of $5 million, necessary to establish subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The second is whether the Court should, in its discretion, afford plaintiff an opportunity to conduct jurisdictional discovery prior to disposition of the Motion, limited to the amount in controversy.

"[B]efore a federal court can decide the merits of a claim, the claim must invoke the

---

In making these calculations based on the alleged class, Westlake does not in any way concede the allegations against it, the appropriateness of the proposed class definition, or the propriety of this action proceeding as a class action. Further, Westlake's proof that the matter in controversy is in excess of $5 million is not an admission or acquiescence that the types of damages and categories of relief sought by Plaintiff are available for the claims pleaded or that Plaintiff or the putative class is entitled to any relief.

jurisdiction of the court." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). In *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014), the Fourth Circuit observed: "Fundamental to our federal system is the principle that '[f]ederal courts are courts of limited jurisdiction.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)) (alteration in *Hanna*); *see United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir.), *cert. denied*, 558 U.S. 875 (2009). Thus, a federal district court may only adjudicate a case if it possesses the "power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2007). Indeed, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Hanna*, 750, F.3d at 432.

If a party seeks to proceed in federal court, it "must allege and, when challenged, must demonstrate the federal court's jurisdiction over the matter." *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). Pursuant to Fed. R. Civ. P. 12(h)(3), "the court must dismiss the action" if it determines that the court lacks subject matter jurisdiction. *See also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006). This is because "jurisdiction goes to the very power of the court to act." *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 196 (4th Cir. 2008).

Notably, a federal court has "an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). Moreover, "[s]ubject matter jurisdiction cannot be forfeited or waived, and can be raised by a party, or by the court *sua sponte*, at any time prior to final judgment." *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010); *see also McCulloch v. Vélez*, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction."); *Snead v. Board of Educ. of Prince George's County*, 815 F. Supp. 2d 889,

9

893-94 (D. Md. 2011). Moreover, "[a] court is to presume . . . that a case lies *outside* its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (emphasis in *Poole*) (citing *Kokkonen*, 511 U.S. at 377).

Section 1441(a) of Title 28 of the United States Code provides that removal is proper only when the federal district court has original jurisdiction over the state court case. To provide a federal forum for plaintiffs who seek to vindicate federal rights, Congress has conferred on the district courts original jurisdiction over "civil actions that arise under the Constitution, laws, or treaties of the United States." *Exxon Mobil Corp.*, 545 U.S. at 552; *see* 28 U.S.C. § 1331; *see also* U.S. CONST. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . . ."). The purported basis for subject matter jurisdiction here is that this is a class action under 28 U.S.C. § 1332(d)(1).

Under 28 U.S.C. § 1332(d)(2)(A), "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant." In the Fourth Circuit, "it is settled that the test for determining the amount in controversy in a diversity proceeding is 'the pecuniary result to either party which [a] judgment would produce . . . .'" *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002) (citation omitted).

As explained by the Fourth Circuit, "when removal is challenged, the removing party bears the burden of *demonstrating* that removal jurisdiction is proper." *Strawn*, *supra*, 530 F.3d at 297 (emphasis in *Strawn*) (citing *Ellenburg*, *supra*, 519 F.3d at 200). Plaintiff insists that Westlake has not established that the amount in this case exceeds the $5 million threshold.

Additionally, Sayre "requests that the Court allow limited discovery related to the amounts Westlake claims are potentially at stake in this litigation." ECF 22 at 3. She complains that she "has not had an opportunity to cross-examine or oppose in any meaningful way" the information submitted by defendant on the subject of the amount in controversy. *Id.* at 4.

On the subject of the amount in controversy in a class action suit, the Supreme Court's recent decision in *Dart Cherokee Basin Operating Co., LLC, et al. v. Owens*, ____ U.S. ____, 135 S. Ct. 547 (2014), provides guidance. The *Dart* Court said that, in the event that the "complaint does not state the amount in controversy, the defendant's notice of removal may do so." *Id.* at 551 (citing 28 U.S.C. 1446(c)(2)(A)). And, "as specified in § 1445(a), a defendant's notice of removal need only include a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. Evidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation." *Id.* at 554. The Supreme Court also said, *id.* at 553-54:

> If the plaintiff contests the defendant's allegation [as to the amount in controversy], § 1446(c)(2)(B) instructs: "[R]emoval . . . is proper on the basis of an amount in controversy asserted" by the defendant "if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds" the jurisdictional threshold.[]

Notably, "the district court must make findings of jurisdictional fact" in connection with the amount in controversy. *Id.* at 554. But, these facts need not be established "'to a legal certainty' . . . ." *Id.* (citation omitted). Rather, they are subject only to the preponderance standard. *Id.*

The *Dart* Court also indicated that "[d]iscovery *may* be taken with regard to [the] question" of jurisdictional discovery *Id.* (emphasis added) (quotations omitted). But, as plaintiff concedes, ECF 22 at 3, "the decision of whether or not to permit jurisdictional discovery

11

is a matter committed to the sound discretion of the district court." *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 216 n.3 (4th Cir. 2002); *see also McLaughlin v. McPhail,* 707 F.2d 800, 806–07 (4th Cir. 1983) (concluding that the district court did not abuse its discretion in denying jurisdictional discovery when "[a]gainst the defendants' affidavits . . . , [plaintiff] offered 'nothing beyond his bare allegations . . . .'").

To determine whether CAFA's $5 million jurisdictional minimum is satisfied, a district court looks to the aggregated value of the putative class members' claims, excluding interest and costs from the calculation. 28 U.S.C. § 1332(d)(6). As indicated, "the test" to determine the amount in controversy is "'the pecuniary result to either party which [a] judgment would produce.'" *Dixon v. Edwards*, *supra*, 290 F.3d at 710 (*quoting Gov't Employees Ins. Co. v. Lally*, 327 F.2d 568, 569 (4th Cir. 1964)). And, a district court may "resolve the jurisdictional facts in dispute by considering . . . affidavits." *United States ex rel. Vuyyuru*, *supra*, 555 F.3d at 348; *see Base Metal Trading, Ltd.*, *supra*, 283 F.3d at 216 n.3.

In *Strawn*, *supra*, 530 F.3d at 297, two consumers brought a putative class action in a West Virginia State court, under West Virginia law. They claimed that defendant AT&T had unlawfully used an opt-in policy for its "Roadside Assistance" program, under which it automatically charged cellular customers in West Virginia a monthly fee unless the customers affirmatively requested to be removed from the program after an initial free-trial period. *Id.* at 294.

AT&T removed the suit to federal court under CAFA. *Id.* at 294. Along with its notice of removal, AT&T submitted an affidavit to establish the amount in controversy. *Id.* The affidavit claimed the jurisdictional amount had been satisfied because: (1) "approximately 58,800 individual consumers 'in West Virginia have remained enrolled in the Roadside

Assistance program beyond the initial free trial period,'" *id.* at 299 and (2) under the West Virginia Consumer Credit and Protection Act, the minimum statutory damages per person equaled $200. *Id.* at 295. AT&T reasoned that if the 58,800 individual customers affected by the opt-in program suffered at the very least the statutory minimum of $200 in damages, the amount in controversy would exceed the $5 million threshold. *Id.* The plaintiffs did not offer any evidence to controvert AT&T's calculations. *Id.* at 299.

The district court remanded the case, finding that AT&T failed to establish the requisite amount in controversy. *Id.* at 294. The Fourth Circuit reversed. It concluded that AT&T's affidavit, which was unchallenged, demonstrated "that the matter in controversy exceed[ed] the sum or value of $5 million, exclusive of interest and costs, and therefore that the jurisdictional amount under CAFA [was] satisfied." *Id.* at 299 (citing 28 U.S.C. § 1332(d)(2)).

*Bartnikowski v. NVR, Inc.*, 307 Fed. App'x 730 (4th Cir. 2009), is also instructive. NVR was "in the business of constructing and selling new homes." *Id.* at 731. Plaintiff Tracy, who worked as a sales marketing representative ("SMR") for NVR, filed a class action suit in federal court pursuant to the Fair Labor Standards Act ("FLSA"), codified at 29 U.S.C. §§ 201 *et seq.*, and included in the suit related state law claims. *Id.* The federal court declined to exercise supplemental jurisdiction as to the state claims. *Id.*

To preserve the state law claims, class members filed suit in their respective state courts. *Id.* Among them, certain plaintiffs filed suit in a North Carolina court. *Id.* at 732. NVR removed that case to federal court, alleging that "the amount in controversy in the case exceeded $5,000,000, thus satisfying CAFA's jurisdictional requirements." *Id.* Plaintiffs moved to remand. *Id.* In its opposition, NVR submitted a declaration from Dennis Littell, NVR's payroll director. *Id.* at 732. Littell stated that "the average annual compensation paid to SMRs in North

Carolina during the two-year time period relevant to the statutory claims[ ] was $145,892, and that North Carolina SMRs worked a total of 1174 'person-months' in those two years." *Id.* at 732-33. In the declaration, Littell did not define the term "person-months," nor did NVR define the term in its opposition to plaintiffs' motion to remand.

"The district court, finding that NVR's estimates of the amount in controversy were too speculative to support removal jurisdiction, granted [plaintiffs'] motion for remand." *Id.* at 731; *see also id*. at 734. On appeal, the Fourth Circuit did "not agree fully" with the district court's assessment, but did reach the same result, based on a critical defect in the defendant's calculations. *Id.* at 734. It explained, *id.* at 735:

> NVR's ultimate estimate of the amount in controversy . . . is fatally undermined by the wholly unsupported assumption on which its calculations ultimately rest-that Plaintiffs and class members will each claim to have worked an average of five hours of overtime per week. NVR concedes that it has kept no records of the number of overtime hours worked by class members,[ ] and the Plaintiffs themselves have offered no evidence on the issue either.

The Court considered the evidence "readily distinguishable" from that presented in *Strawn*. *Id.* at 738. It highlighted that, unlike the calculation offered by NVR, AT&T's calculation in *Strawn* was based on a precise count of the number of consumers in West Virginia affected by the program and the minimum statutory damages of $200 per person under West Virginia law. *Id.* Further, the Court emphasized that, unlike NVR's estimate, AT&T's calculation did not rest upon "an assumption that finds [no] support in the record . . . ." *Id.* at 738. As such, the *Bartnikowski* Court concluded: "Because NVR has presented no credible evidence to support the 'five hours' assumption, NVR simply cannot satisfy its burden of demonstrating that jurisdiction would be proper." *Id.* at 737.

With these cases in mind, I turn to Zhan's Affidavit. He averred that "the pecuniary harm to Westlake would consist at a minimum of: (1) refunds to borrowers who paid Westlake more

14

than the principal amount of their loan; and (2) the inability of Westlake to collect amounts owed by borrowers above the principal amount of their loan." ECF 20-1 ¶ 3.  In particular, Zhan posits that, between January 19, 2006 and January 23, 2015, when the Complaint was filed, Westlake has 2,521 accounts that meet the criteria of the proposed class. *Id.* ¶ 8.  And, "the account debtors within the purported class definition owed Westlake $6,383,983 over and above the original principal amounts of the loans." *Id.* ¶ 9.  Moreover, according to Zhan, Westlake "had collected from 986 accounts a total of $2,690,396 in excess of the principal amount of those loans."  He adds that "this amount represents potential refunds that Westlake would have to provide. . . ." if plaintiff prevails.  *Id.*  Thus, according to his calculations, the total amount in controversy is $9,074,379. *Id.* ¶ 11.

Based on the Zhan Affidavit, I find that Westlake has established, by a preponderance of the evidence, the requisite amount in controversy.  In this regard, C.L. § 12-1018(a)(2) is pertinent.  It states: "[I]f a credit grantor violates any provision of [CLEC] the credit grantor may collect only the principal amount of the loan and may not collect any interest, costs, fees, or other charges with respect to the loan."  Zhan's calculation comports with C.L. §12-1018.  It is also consistent with Fourth Circuit case law interpreting CLEC, which recognizes that a "'debtor's relief under CLEC'" is limited to "'amounts paid in excess of the principal amount of the loan'" *Gardner v. GMAC, Inc., et al.*, ____ F.3d ____, No. 14-1049, slip op. at 6 (4th Cir. August 6, 2015) (quoting *Bediako v. American Honda Finance Corp.*, 537 F. App'x 183, 186 (4th Cir. 2013)).  Moreover, Zhan's analysis does not rely on conjecture or an "unsupported assumption."  Nor has Sayre criticized the components of Zhan's analysis or offered any evidence to cast doubt on the reliability of his calculations.  She merely complains that she has not had an opportunity to verify his calculations by way of discovery.  ECF 22 at 5, Reply.

Because defendant has presented a reasonable basis to support its assertion as to the amount in controversy, there is no need to engage in a jurisdictional fishing expedition that would delay the progress of this case. However, plaintiff may explore the amount in controversy as part of the ordinary discovery process. And, if discovery establishes that the jurisdictional amount has not been met, the Court will entertain another motion to remand for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, I will deny the Motion to Remand (ECF 13). A separate Order follows, consistent with this Memorandum.

Date: August 7, 2015   /s/
Ellen Lipton Hollander
United States District Judge